[Civ. No. 1886. Second Appellate District.—September 27, 1917.]

LOUIE DICK, Respondent, v. THE CITY OF LOS ANGELES (a Municipal Corporation), et al., Appellants.

MUNICIPAL CORPORATIONS—STREET IMPROVEMENTS—DIVERSION OF WATER UPON ADJOINING PROPERTY OWNER. — A municipal corporation by reason of its control over streets and the power to grade and improve them has no absolute and unconditional legal right intentionally to divert the water therefrom, as a mode of protecting the streets, and to discharge it, by artificial means, in increasing quantities and with collected force and destructiveness upon the property of the adjoining owner.

ID.—ACTION FOR DAMAGES—DESTRUCTION OF CROPS ON LEASED LAND— OVERFLOW OF WATERS FROM STREET GRADING—WAIVER OF DAMAGES BY LANDLORD—TENANT NOT ESTOPPED BY.—In an action against a municipal corporation for damages for the destruction of crops on leased land from surface waters collected by a system of street grading and overflowing upon the land, the fact that the lessor had waived all damages resulting from the street improvement in consideration of the granting of his petition and that of other property owners for the making of the improvement cannot be set up as a waiver as against the plaintiff, where the waiver was not set up in the answer and the city constructed the work differently from that asked for in the petition.

APPEAL from a judgment of the Superior Court of Los Angeles County, and from an order denying a new trial. Eugene P. McDaniel, Judge Presiding.

The facts are stated in the opinion of the court.

Albert Lee Stephens, City Attorney, and Charles S. Burnell, Assistant City Attorney, for Appellants.

Lloyd, Cheney & Geibel, and O. N. Normandin, for Respondent.

CONREY, P. J.—Action to recover damages for the unlawful destruction of crops owned by the plaintiff on leased land. The defendants are the city of Los Angeles and three persons who constituted the board of public works, of that city. The defendants appeal from the judgment and from an order denying their motion for a new trial.

Vermont Avenue, in the city of Los Angeles, runs in a northerly and southerly direction. It is crossed by Slauson Avenue, running in an easterly and westerly direction. The right of way of the Atchison, Topeka, and Santa Fe Railway Company adjoins and parallels Slauson Avenue on the north side at and in the vicinity of the crossing of Vermont Avenue. The land on which the crops were grown consists of about thirteen acres adjoining the north side of the railroad right of way and fronting along the westerly line of Vermont Avenue a distance of 590.25 feet. At all times mentioned in the complaint the land was owned by F. P. Dalton and two other persons, and was occupied by the plaintiff as tenant of the owners, the tenancy being from month to month. The damage to plaintiff's crops of vegetables was caused by the overflow of water from Vermont Avenue, resulting from two certain rainstorms which occurred in January or February, 1913, and at about the same period of the year 1914. During the latter part of the year 1911 and the early part of the year 1912, the city of Los Angeles caused certain work to be done, consisting of the grading, paving, guttering, and curbing of Vermont Avenue from Santa Barbara Street to the south line of Fifty-eighth Street (the next street north of Slauson Avenue), and the grading and curbing of Vermont Avenue to the Santa Fe right of way, and the grading, macadamizing, guttering, and curbing of Slauson Avenue at and adjoining its intersection with Vermont Avenue. The plaintiff bases his cause of action upon certain alleged facts concerning the plan and construction of said improvements, and alleges that the flooding of his land was caused by those improvements as constructed. The principal facts in issue at the trial are shown by certain findings of the court which follow and affirm the allegations of the complaint, as follows: In finding IV it is stated: ''That the specifications and construction of said work were and are such that at the said intersection of Slauson Avenue and Vermont Avenue, the grade of Slauson Avenue was not made and is not the same grade as Vermont Avenue, and the drainage of Vermont Avenue ended there in a cul-de-sac, except as to a small culvert box and a small amount of drainage down the right of way of the Atchison, Topeka, and Santa Fe Railway Company, when the water backs up to a sufficient height. That as a part of said work and as a manifest fault in the construction and plans, defend-

ants filled up a ditch or waterway on the westerly side of Vermont Avenue and made no provision for carrying off the water theretofore carried therein, but, on the contrary, made said street carry the water theretofore carried by said ditch up to said Slauson Avenue and there deposit same without any drainage except the small culvert box aforesaid. That as constructed said culvert box drains away only a small portion of the water carried to and deposited at said place by ordinary rains and said water thereupon backs up and floods plaintiff's land and adjacent lands. That defendants had constructed a culvert box on the easterly side of Vermont Avenue under said Santa Fe railway right of way into Slauson Avenue, but said box caused water to run from Slauson Avenue back into Vermont Avenue and was nailed up." In finding V it is said: " . . . ; that said work upon and paving of Vermont Avenue conducted a greatly increased flow of water southerly along said Vermont Avenue, being water that had not theretofore flowed there; that defendants had a pipe or drain under Vermont Avenue from the east to the west side thereof immediately north of the Santa Fe right of way, by which drain the waters which had formerly flowed in a southerly direction on Vermont Avenue were diverted from the easterly side of Vermont Avenue to the westerly side of Vermont Avenue and deposited upon plaintiff's said leased land; that the said defendants failed to provide for the drainage or escape of such increased flow of waters or the adequate escape of any waters flowing south on Vermont Avenue at this locality, but, on the contrary, banked up and stopped the same." The court found and the evidence shows that prior to the paving of Vermont Avenue no storm, drainage, or other waters ran upon or through plaintiff's said leased lands so as to injure the same.

Appellants claim that the findings are not sustained by the evidence. Prior to the street work, Slauson Avenue had been higher than Vermont at the intersection of the streets. The land in the vicinity had not been included, at that time, within the city limits. The county's roadworkers had filled that part of Vermont Avenue for some distance north of the railroad right of way in order to raise the road to a convenient level for driving across the right of way. Prior to the street work there were culvert boxes, one on the east side of Vermont Avenue and one on the west side of Vermont Avenue,

to carry water under the right of way and under Slauson Avenue. When the street work was done these culvert boxes were retained and an additional box for the passage of water was placed alongside the old one on the west side of Vermont Avenue, and thereby the drainage facilities were increased; although, as we shall see, the increase was not enough to carry all the water that might come to that point during heavy rainstorms. Respondent claims that Slauson Avenue was higher after it was paved than before. We do not so understand the testimony. Apparently the fact was, as stated by the witness Matteson (of the city engineer's office), that Slauson Avenue at that crossing was not at a greater level after the paving work was done than it was previous thereto, relative to Vermont Avenue. Fifty-eighth Street extends easterly from Vermont Avenue and if extended westerly would pass through the plaintiff's land. Matteson's uncontradicted testimony is that the elevation of the curb on the west side at Fifty-eighth Street was changed by decreasing it two hundredths of a foot, and that "the curb at Slauson was one foot seven inches lower than the track before the paving, *it is the same now.*" We understand that the track referred to is the Santa Fe railroad track at its Vermont Avenue crossing. The essential fact is that after the street work was done, as also before the work was done, there would always be some accumulation of water on Vermont Avenue immediately north of the railroad, whenever the water came down that avenue faster than it could escape through the culverts or through a ditch next to the railroad right of way. And since the general grade of the country fell away toward the west, any large accumulation of water at that place on Vermont Avenue would naturally find its way across the plaintiff's land. This tendency was probably increased by the fact found by the court that the defendants filled up a ditch or waterway on the westerly side of Vermont Avenue and made no provision for carrying off the water theretofore carried therein. Appellants attack this finding, but we think not successfully. The witness Dalton said that the gutters on both sides were narrowed by the filling in of earth "to make the approach to the railroad," and we have not observed that there was any other evidence on that point.

The court found also "that said work upon and paving of Vermont Avenue conducted a greatly increased flow of water

southerly along said Vermont Avenue, being water that did not theretofore flow there.'' Counsel for appellants claim that there is no testimony in the record which supports this finding. In response, our attention is directed to the testimony of the witness Hufford, which is to the effect that prior to the paving of Vermont Avenue, water would run down Vernon Avenue (a street parallel to Slauson Avenue and about a mile north thereof); ''there was a little high sand ridge, and the water would come down there practically on Santa Monica Avenue to Vernon Avenue, and take down Vernon Avenue to the west, and after they put in the street paving through there, they naturally put it down to the grade which lowered it lower than either side, the water would naturally run from the west back to the east, and from the east back to the west to Vermont Avenue.'' Thus it was shown, and not contradicted, that there was a sand ridge running across Vermont Avenue which kept water from running down Vermont Avenue from points at or north of Vernon Avenue, and that this ridge was removed when the city in doing the street work on Vermont Avenue paved the street at the level of the established grade. Counsel for respondent only offer, in addition to the foregoing facts, their own suggestion that the natural result of the paving itself added to the flow of the water by substituting a paved surface for the dirt surface theretofore existing.

It is not necessary to discuss the other specifications of the particulars in which it is claimed that the evidence is insufficient to justify the findings. There is no evidence that the city diverted to Vermont Avenue, and to the land occupied by the plaintiff, any natural stream of water. Nor was there any stream whatever other than the ditches which carried surface water when it reached the streets. The natural drainage of surface waters in that part of the city is toward the west. Whenever rainstorms caused surface waters to drain from the east of Vermont Avenue so as to reach that thoroughfare, they ran down Vermont Avenue, except as above stated. *Los Angeles Cemetery Assn.* v. *Los Angeles*, 103 Cal. 461, [37 Pac. 375], is a case relied upon by both sides in this action. In that decision the court, following *Palmer* v. *Waddell*, 22 Kan. 352, said that ''the rule that the owner of a tract of land may obstruct the flow of surface water across his land appears to and does have an exception, which is

where surface water, having no definite source, is supplied
by the falling rains and melting snows from a hilly region or
high bluffs, and, owing to the natural formation of the sur-
face of the ground, is forced to seek an outlet through a gorge
or ravine, and by its flow assumes a definite or natural chan-
nel, and escapes through such channel regularly during the
spring months of every year, and in seasons of heavy rains.''
It was held in *Los Angeles Cemetery Assn.* v. *Los Angeles,*
*supra,* that since the embankment placed by the city across
First Street did obstruct the flow of a natural watercourse of
the kind above described, the case came within the exception
stated, and the city could not lawfully turn the flow upon
adjacent lands to their injury.  But the city was protected
from liability in that action, because the overflow which
caused plaintiff's damage was occasioned by an extraordi-
nary flood, which could not have been reasonably foreseen.
In the same case the court affirmed the general rule and stated
the exception, by saying that as to ordinary surface water,
if the injury to plaintiff was caused by grading a public
street to its established grade, and plaintiff could grade its
property so as to conform to the established grade, whereby
the surface water would flow off, and not stand upon its prop-
erty, the plaintiff could not recover.  But the court held that
the rule has no application to a case where surface water as-
sumes the form of a regular stream or watercourse and the
case comes within the exception before stated.  In *Conniff* v.
*San Francisco,* 67 Cal. 45, [7 Pac. 41], the court said: ''It
is well settled that a municipal corporation has no right . . .
to stop up a natural channel through which waters run by an
embankment made in grading a street, under its general
power to grade and improve streets.''

In *Lampe* v. *San Francisco,* 124 Cal. 546, [57 Pac. 461,
1001], the court said: ''As we understand it, damages are
claimed because the grading of the street, which is the prop-
erty of defendant, prevents the surface water from flowing
off the lands of the plaintiff and on to the lands of defend-
ant as it had been wont to flow.  The question is as to whether
or not defendant is liable for damages caused by the obstruc-
tion of the flow of surface waters from the lands of plaintiff,
occasioned by the necessary and lawful grading of defend-
ant's street in front of plaintiff's said lands.  Upon the solu-
tion of this question depends the result as to whether or not

this judgment shall be affirmed.'' The court then quotes with approval from Dillon on Municipal Corporations, to the effect that where the work of grading or improving streets has caused damage by surface water to private property and the damage has resulted solely as a consequence of the proper execution of a legal power by the corporation, there is no implied liability therefor. The court further said: ''There is in some of the books an apparent exception to the general rule in that class of cases where the surface water, owing to the conformation of the country, has found for itself a definite channel in which it is accustomed to flow, in which class of cases it is said that the municipal corporation, in making an embankment while grading its streets, should erect a culvert or waterway so as not to obstruct the flow of the surface waters in their well-defined channel.''

The ditch on the west side of Vermont Avenue which it is specially complained was made narrower by the street work here in question was not a channel which the water had found for itself and had none of the characteristics of a natural channel. It had been formed on one side by the plaintiff or his predecessors who threw up the earth at the end of the rows in plowing. On the other side of the ditch a wall had been formed by reason of the work done by the county, as we have heretofore stated, before this land became a part of the city of Los Angeles. Moreover, it does not appear that the water which came into Vermont Avenue from Vernon Avenue was derived from any watercourse, or had any characteristics other than that of surface water which comes to a street and runs along its gutters.

From the decisions thus far mentioned it might seem to follow that the plaintiff in this case has not established a cause of action. But notwithstanding these decisions, we are unable to say that the nonliability of cities, for damages caused under circumstances like those shown in this case, is clearly and finally established. In none of those cases did the city, by its street grading work, cast upon private property water which by a system of streets was collected in large quantities at one place, with consequent overflow and damage to adjacent land. In *Lampe* v. *San Francisco*, 124 Cal. 546, [57 Pac. 461, 1001], the court refers to *Stanford* v. *San Francisco*, 111 Cal. 198, [43 Pac. 605], and summarizes that case in these words: ''The question in that case was as to

whether or not the city was liable for damage caused by the accumulation of surface water which was the necessary consequence of paving the streets. It appears that by reason of the grading of the street large quantities of surface water accumulated and broke over the curbing and ran into the basement occupied by the plaintiff. In the opinion, after discussing the principle upon which the city was held liable, it is said: 'Nor is this case within that numerous class of cases where it is held with almost entire unanimity that a municipality is not bound to protect from surface water those who may be so unfortunate as to own property below the level of the street.' In this case there is no allegation that the grading of the street caused surface waters to accumulate in unusual quantities, and that such surface waters were turned upon the lands of the plaintiff.'' The plain inference is that if such allegation had been made, the complaint would have stated a cause of action. The two decisions last above mentioned are in harmony with the conclusion reached by Mr. Dillon. In section 1736 of his work on Municipal Corporations, fifth edition, he says: ''We agree to the doctrine that the municipality is not bound to protect from surface water those who may be so unfortunate as to own property below the level of the street; nor is the duty a perfect one, to adopt a system or mode of drainage which will have this effect; and if one be adopted, there is *in general,* as hereafter shown, no liability except ·as to ministerial duties in connection therewith. It is possible there may be no middle ground; but we are unable to assent to the doctrine that by reason of their control over streets, and the power to grade and improve them, the corporate authorities have the absolute and unconditional legal right intentionally to divert the water therefrom, as a mode of protecting the streets, and to discharge it, by artificial means, in increased quantities and with collected force and destructiveness, upon the property, perhaps improved and occupied, of the adjoining owner.''

Appellants contend that the flooding of plaintiff's crops occurred only during extraordinary and unprecedented rainfall and that for this reason he is not entitled to recover. The court's finding against this contention is not entirely without support in the evidence. The plaintiff's witness Wildasin, on cross-examination, said: ''I don't know that I could of my own knowledge state whether or not the rain

this last winter, 1913, was a heavier rain than is usual in Los Angeles in that part of the city. I know we had a lot of wet years and we have had some very dry years, and I remember 1884 being a very wet year, and somewhere along in the nineties. I don't think it is a question of big rains. I have lived thirty years in that neighborhood, and in that time I don't know of many rains as heavy as those in January and February of this year, with the possible exception of 1884 and 1889. It is among the heaviest at least." This testimony comes short of being such evidence as would compel the trial court to decide that the rains of 1913 and 1914 were so excessively unusual and so unprecedented that the city in making its plans need not have calculated upon the possibility or probability of such rains.

The fact is, and it was admitted by Mr. Matteson and found by the court, that it was contemplated (but no official action was taken to that end), that the city would obtain a right of way or open a street to flow water from Vermont Avenue westerly across and at about the center of plaintiff's leased land; and that the city proceeded to complete its Vermont Avenue work without waiting to obtain said right of way or to open said street.

Further it is contended that the plaintiff is not entitled to recover because his landlords had waived all damages which might result from the improvement of the streets. It was shown in evidence that on June 17, 1909; said property owners, together with other owners of property fronting on Vermont Avenue between Santa Barbara Avenue and Slauson Avenue, petitioned the city council to improve Vermont Avenue between those limits by doing certain work, which included asphalt paving of the street together with other work specified, and requested that such improvements be made according to the official grade of the street. In that petition they said: "In consideration of the granting of said petition and of doing the work therein mentioned, we (each for himself) do hereby waive any right which we may now have or may hereafter have, to make or prosecute any claim or demand against the city of Los Angeles, or the contractors for said improvement, for damages caused by said improvement or arising from the nature thereof, and particularly by any damages to our property occasioned by any cuts, excavations, retaining walls, fills, culverts, storm-drains or sewers

in, along or across the street in which said work is to be done." Let it be assumed, although the proposition is disputed, that the plaintiff's claims herein are subject to that stipulation and that it limits his right of recovery herein the same extent that the rights of his landlords would be limited if they were making this claim for damages caused to crops of their own on said land. The contention may be answered in two ways. The appellants did not allege in their answer anything whatever in regard to said petition, and claimed neither waiver nor estoppel. Appellants respond to this that no objection was made when the waiver was offered in evidence. On inspection of the record we find that objection was made that the evidence was incompetent, irrelevant, and immaterial, that no foundation had been laid therefor, that it was not a waiver of the conditions shown to exist in this case, and that it would in no event be binding upon the plaintiff. We think that this was sufficient to cover the point that the defense which the document was offered to sustain was not included within the issues presented by the pleadings. And it was true, as stated in the objection, that the document did not contain a waiver under the conditions shown to exist. The petition called for asphalt paving to be done throughout the entire distance down to Slauson Avenue, whereas in fact the paving as completed did not include Vermont Avenue between Slauson Avenue and Fifty-eighth Street. It was admitted that that last section of the paving was omitted or postponed for the reason above noted that the city authorities were expecting to extend Fifty-eighth Street westerly across the land occupied by the plaintiff and that drainage facilities would be obtained along that new street. The city having elected to make these differences between the work as constructed and the work as asked for by the petition of the property owners, should not be permitted to take advantage of a waiver which was only made upon conditions with which the city did not comply.

We agree with appellants that no cause of action was stated or proved as against the defendants O'Brien, Handley, and Johnson. As to those defendants, the judgment and order are reversed. The judgment against the city of Los Angeles is affirmed, and the order denying the motion of the city of Los Angeles for a new trial is affirmed.

James, J., and Shaw, J., concurred.